Paterson Boiler & Tank, Inc. v. Commissioner.
Paterson Boiler & Tank, Inc. v. Commissioner
Docket No. 7575.
United States Tax Court
1947 Tax Ct. Memo LEXIS 250; 6 T.C.M. (CCH) 383; T.C.M. (RIA) 47089; April 11, 1947
*250 John W. Hand, Esq., and John J. White, C.P.A., 129 Market St., Paterson, N.J., for the petitioner. A. H. Monacelli, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in the amounts of $4,411.61 in income tax, $3,085.89 in declared value excess profits tax, $11,625.60 in excess profits tax for the calendar year 1941, and $25,638.43 in excess profits tax for the calendar year 1942. The deficiencies grew out of the disallowance by the Commissioner of a part of claimed deductions on account of officers' salaries paid by petitioner for the years 1941 and 1942. Certain other minor adjustments were made which are not here in issue. Findings of Fact Petitioner is a New Jersey corporation which filed its corporation income and declared value excess-profits tax and excessprofits tax returns for the years 1941 and 1942 with the collector of internal revenue for the fifth district of New Jersey. William H. Long is president of the petitioner corporation, and Dorothy H. Long, who is his wife, is secretary and treasurer. Both had studied architecture at Cornell University, Long for four years, and his wife *251 for five, in the course of which both studied design engineering, material construction, mathematics and graduated with a degree of Bachelor of Architecture. Before he attended Cornell, Long worked for about five years in a shop in Youngstown, Ohio, and after he left Cornell, he worked for the Buffalo Tank Co. at Buffalo, New York. He had learned welding at Youngstown, but he began working for the Buffalo company in the capacity of night watchman white the company was building its plant. He helped also in the construction of the plant, and during its first year of operation he did steel fabrication work. Then he resumed work as a welder and a helper, during which time he worked on almost every one of the machines in every one of the shops, doing pressing and riveting work as well as welding. At that time, most steel tanks were riveted, but Long became convinced that welding would be used more and more in the future, and for that reason he concentrated on welding. The Buffalo company began to make the only all-welded storage tank on the market at that time. Except for one winter when he attended New York University, he worked for the Buffalo company until 1932. He advanced to the *252 office, where he was assistant office manager, and learned the selling, shipping and invoicing phases of the business. In about 1931 the Longs were married. After her graduation from college, Dorothy had been employed for five years with an architectural firm in Buffalo. She started as a draftsman, and became office manager, where she had charge of shop drawings, and details of office management, and also supervised, to some extent, the work in the field, materials, contracting, etc. She was also in charge of personnel. About a year after they were married in 1931, the Longs decided that they would like to go into business for themselves. They wished to locate in the New York metropolitan area because of the potential market there, and in order to save freight expenses. After some investigation they found an old boiler plant at Paterson, New Jersey, which met their needs and a part of which they leased. They began operating in one section of the plant in the spring of 1932. In June, they caused the formation of the petitioner corporation. They had almost no capital of their own. Each invested $100 in the venture, and Dorothy's mother invested $800, or a total of $1,000, for which *253 preferred stock was issued. The common stock was issued to both for their services prior to the incorporation and for such materials, orders and accounts receivable as they had on hand by virtue of the operations during the several months before the corporation was organized. They each held 299 shares of common stock, and Dorothy's father held two qualifying shares. They had brought with them from Buffalo three men who constituted their staff. Two were shop men, and one was an engineer. The latter stayed only three weeks, however. Long worked in and supervised the shop, and did the selling; Dorothy worked in the office, attempting to establish credit and secure money enough to buy raw materials and pay expenses. The industry generally was in the depths of the depression, and the survival of the new corporation required the utmost effort and perseverance on the part of its officers. At the end of its first year of operation, its cash balance was $64.77. Petitioner, at that time, made steel storage tanks for the oil and gasoline trade, largely 275, 550 and 1,000 gallon tanks. The business grew gradually but satisfactorily during the next few years, although it was operated on *254 such a narrow margin of liquid assets that it was frequently necessary to resort to borrowing money, for which the Longs pledged their personal credit. Additional employees were secured as conditions permitted, and in 1935, petitioner bought the whole building in a portion of which it had theretofore been operating under lease. They continue to expand from 28,000 square feet in 1936 to 71,000 square feet by 1941. Some additions and improvements were made to the building from time to time. By the time of the hearings it was a thoroughly modern and efficient shop. During the first years, the business was secured by Long from contacts which he had formed earlier. When an order was received, Long and his two shop assistants ran the crane, rolled the plates, and the welding was done by Long himself. Dorothy Long did all the designing and engineering, as well as securing the raw materials and financing. They made a policy of giving their personal attention to the individual needs of their customers, and, as a result, they acquired a reputation for quality work and services which enabled them to meet the competition which was at that time very keen. They lived in a single room in Paterson, *255 and devoted all their time and energies, to the business which showed substantial progress during each succeeding year, as shown by the following table, which also shows the compensation paid the officers involved in the proceeding. Officers' Compensation
Secretary-
Treasurer
Pres. Salary
Salary
Year
Net Sales
Gross Profit
& Bonus
Commission
& Bonus
1932
$ 27,257.97
$ 1,459.68
$ 700.00
.00
$ 350.00
1933
95,706.85
9,228.36
2,400.00
.00
2,400.00
1934
128,519.68
16,807.65
3,900.00
.00
2,600.00
1935
198,108.01
34,664.32
7,800.00
.00
3,900.00
1936
312,113.65
61,949.47
12,000.00
3,747.56
7,500.00
1937
405,069.23
68,864.12
12,000.00
6,423.11
7,500.00
1938
356,256.68
78,469.67
12,000.00
.00
7,500.00
1939
582,279.50
146,540.11
12,000.00
6,093.55
7,500.00
1940
595,634.91
138,933.65
12,000.00
7,177.21
7,500.00
1941
839,253.08
251,608.66
29,500.00
10,601.12
20,000.00
1942
784,518.92
277,093.05
29,500.00
12,163.36
20,000.00
1943
762,160.06
220,117.23
29,500.00
12,873.65
20,000.00
1944
829,815.26
212,821.68
29,500.00
14,807.29
20,000.00
1945
983,440.93
229,630.07
29,000.00
11,109.00
20,000.00
1946
941,621.05
320,639.52
14,500.00
10,000.00
(1st half)
*256 From time to time the Longs put additional money into the business for which preferred stock was issued. By 1939 the total preferred stock outstanding was $86,500. During the years 1932 until 1939 when it was redeemed by the issuance of debenture bonds, dividends of 7% were paid each year when due on the preferred stock, which represented the only paid-in capital of the corporation. Interest at the rate of 7% has been paid each year when due on the debentures so issued in 1939. Additional bonds were issued by petitioner subsequent to 1939, so that during the taxable years there were outstanding bonds in the amount of $103,600 and $119,600 respectively. On the additional bonds interest is paid at the rate of 4%. One dividend was paid on the common stock in the amount of $4,490 in 1936. During all the years involved, the two officers whose compensation is in question carried the entire burden of the executive and managerial responsibilities, having no department heads or other executives to whom such work could be delegated. The nature of the work changed materially due to the defense and war effort, from repetitive work to special contracts work. These changes required no extra *257 shift to be worked, and imposed additional work and greater responsibility on the officers, who worked several nights each week as well as some Saturdays and Sundays. Petitioner had 38 employees in 1936 and 77 in 1942. Its two most highly paid employees who received $6,000 in 1938, received $15,000 and $12,000 in each of 1941 and 1942. From 1937 through 1942, hourly labor rates paid by petitioner rose from 70" to $1.15 for welders; from 45" to 65" for helpers; from 55" to 95" for fitters; from 50" to 90" for testers, and from 60" to $1.00 for burners. A comparable business with gross sales of $400,000 in 1941 and $600,000 in 1942 paid its president for those years $19,000 and $35,000 respectively; another with gross sales of $1,200,000 in 1941 and $1,800,000 in 1942, paid its president $55,000 and $85,000, respectively. After payment of all expenses, including the compensation here in question, the surplus account reflected the following changes at the end of the years set forth below: 1932
$ 1,809.82
1933
332.38
1934
779.80
1935
219.44
1936
35.91
1937
-2,856.17
1938
-4,017.47
1939
-2,331.59
1940
4,576.73
1941
28,424.53
1942
14,783.15
The *258 surplus account of petitioner showed a deficit for each of the years 1932 to 1940, inclusive, and a surplus in 1941 and 1942 in the respective amounts of $23,353.74 and $38,136.89. The compensation paid by petitioner in 1941 and 1942 to its president and secretarytreasurer, was reasonable and constituted an ordinary and necessary expense of the business. Opinion KERN, Judge: The question before us is whether the payments of compensation made by petitioner to its president and its secretary-treasurer, are reasonable in amount, under the facts of the case. After a careful consideration of these facts, which are set forth in considerable detail in our findings, we are of the opinion that the payments made during the taxable years by petitioner to its president and secretary-treasurer constituted reasonable allowances or other compensation for personal services actually rendered within the meaning of section 23 (a) (1) (A) of the Internal Revenue Code. This ultimate finding is, of course, limited to the years 1941 and 1942 and is dependent upon the evidentiary facts established by the record in the instant proceeding. The two points largely relied on by *259 the respondent are the fact that dividends were not regularly paid on common stock, and that the increase in business and the profits arising therefrom were the results of the war and not of any additional services of the officers. With respect to dividends paid on common stock, a rather unusual situation obtains. The only money invested in the business prior to 1940 was represented first by preferred stock, and later (in 1940) by debenture bonds. It is not disputed that dividends and interest, respectively, at the rate of 7% were paid on these when due. The common stock was issued as compensation to the two officers for their pre-incorporation services, and for a small amount of materials, accounts receivable and orders which they had accumulated during the few months immediately preceding the incorporation. It represented no paid-in capital in the form of cash. All the paid-in capital represented by the preferred stock and bonds, received a return of 7% even during the early years. The substantially increased additions to surplus in 1941 and 1942 have resulted in a net equity value of petitioner's common stock. However, prior to 1941 petitioner's surplus account showed a deficit *260 for each year, and during those years the reasonableness of officers' compensation is not questioned by respondent. The failure to pay dividends on common stock is not, under these special circumstances, of such compelling importance as to require a decision in favor of respondent. The fact that the profits of the business which were earned during the war years grew out of war contracts does not arise as a novelty in this case. It has frequently been urged in these cases, but where, as here, the war business resulted in increased work and responsibility, as well as profits, the fact that the business was related to the war effort does not, of itself, militate against the allowance of increased salaries. We are of the opinion that the respondent erred in disallowing the deduction claimed. Decision will be entered under Rule 50.